**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | | |
|---|---|---|
| **K.A.P.,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Case No. 5:20-cv-00109-CHW** |
| | : | |
| **COMMISSIONER OF SOCIAL SECURITY,** | : | **Social Security Appeal** |
| | : | |
| **Defendant.** | : | |
| | : | |

## <u>ORDER</u>

This is a review of a final decision of the Commissioner of Social Security denying Plaintiff's application for disability insurance benefits and social security income. The parties consented to have a United States Magistrate Judge conduct all proceedings in this case, and as a result, any appeal from this judgment may be taken directly to the Eleventh Circuit Court of Appeals in the same manner as an appeal from any other judgment of the United States District Court. Because substantial evidence supports the Commissioner's decision, the decision in Plaintiff's case is **AFFIRMED**.

## BACKGROUND

Plaintiff applied for disability insurance benefits and social security income on August 3, 2016. (R. 281). Plaintiff was 43 years old at the time. (R. 279). Plaintiff alleged she became disabled on December 31, 2015, due to human papilloma virus ("HPV"), bipolar disorder, osteoarthritis, and cervical squamous cells carcinoma. (R. 283). Plaintiff's applications were denied initially and upon reconsideration. (R. 115, 126, 147, 166). Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), and one was held on April 8, 2019. (R. 47, 79). The ALJ issued an unfavorable decision on May 31, 2019. (R. 35). Plaintiff's request for review of that

decision by the Appeals Council was denied on January 27, 2020. (R. 1). The case is now ripe for judicial review. *See* 42 U.S.C. § 405(g).

Plaintiff filed the instant complaint on March 19, 2020, challenging the ALJ's decision on the grounds of a lack of substantial evidence. (Doc. 17, p. 1). Specifically, Plaintiff complains that substantial evidence does not support either the ALJ's decision to discredit Plaintiff's subjective pain limitations, nor the weight accredited to Dr. Debra Lewis, a consultative examiner. (*Id.*) Defendant filed a brief in support of the Commissioner's decision, (Doc. 18), to which Plaintiff subsequently replied. (Doc. 19).

## STANDARD OF REVIEW

Judicial review of a decision of the Commissioner of Social Security is limited to a determination of whether that decision is supported by substantial evidence, as well as whether the Commissioner applied the correct legal standards. *Winschel v. Comm'r*, 631 F.3d 1176, 1178 (11th Cir. 2011). "Substantial evidence" is defined as "more than a scintilla," and as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. The Eleventh Circuit has explained that reviewing courts may not decide the facts anew, reweigh the evidence, or substitute their judgment for that of the Commissioner. *Id*. Rather, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if the evidence preponderates against it.

## EVALUATION OF DISABILITY

Social Security claimants are "disabled" if they are unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations outline a five-step sequential evaluation process for determining whether a claimant is disabled: "(1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant number of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience." *Winschel*, 631 F.3d at 1178 (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v); 416.920(a)(4)(i)-(v)).

## MEDICAL RECORD

### I.   Physical Health

The relevant[1] medical record pertaining to Plaintiff's physical impairments begins in October 2015, when Plaintiff presented to Grady Hospital for pain in her knees. (R. 577). She had a physical exam which revealed normal range of motion and no apparent distress. (R. 584). On November 20, 2015, when Plaintiff returned to Grady, she complained of left lower back pain that radiated to her thigh. (R. 628). Walking reportedly exacerbated her pain, but resting and lying on the floor with her legs elevated relieved it. (*Id.*) A physical examination revealed Plaintiff had no distress, joint deformities, edema, synovitis, or effusion. (R. 631). Plaintiff exhibited tenderness to palpation throughout her lumbar spine, and while the right straight leg raise provided relief, the left exacerbated her pain. (R. 631). She also had pain when leaning to the left side and backwards, and her decreased sensation in her left leg seemed subjective given her intact sharp, dull, and light

---

[1] With respect to her physical impairments, Plaintiff challenges the ALJ's findings only as they relate to her alleged back, leg, and knee pain. (*See* Doc. 17, pp. 14-17). Therefore, this decision discusses the medical records as they pertain to such pain.

3

touch. (*Id.*) Plaintiff had symmetrical plantar reflexes, with 4+/5 strength in her left lower extremity and 5/5 in her right. (*Id.*) An MRI conducted on December 4, 2015, confirmed that Plaintiff had degenerative disc disease at T10-T11, L4-5, and L5-S1, advanced ongoing facet degermation at L4-L5, and moderate left subarticular stenosis at L5-S1. (R. 673).

Plaintiff attended a primary care appointment at Grady on March 4, 2016, complaining of pain in both knees, the right worse than the left. (R. 787). Plaintiff did not appear to be in distress upon examination and exhibited a full range of motion in all four extremities. (R. 790). An x-ray of Plaintiff's right knee confirmed her tricompartmental osteoarthritis. (R. 794). Plaintiff returned to Grady on June 17, 2016, with continued pain in both knees, but reportedly walked one to two hours a day. (R. 899). On physical examination, Plaintiff had normal gait and range of motion in all extremities; had no distress, pitting edema, nor joint effusion; and had crepitus in her left knee. (R. 902). An x-ray of her left knee revealed tricompartmental osteoarthritis. (R. 907). She received a steroid injection in her left knee on August 31, 2016. (R. 977).

On January 5, 2018, Plaintiff attended a physical therapy session for her knees. (R. 1172). On examination, Plaintiff had bilateral edema and diminished ranges of motion with her knee flexion at 101 degrees on the left and 45 degrees on the right, knee extension at 5 degrees on the left and 10 degrees on the right, and hip flexion at 95 degrees on the right and 40 degrees on the left. (R. 1174). Plaintiff also had limited strength in her hips with flexion at 3+/5 on the left and 1/5 on the right, and extension at 3/5 on the left and 2+/5 on the right. (*Id.*) The physician, however, noted Plaintiff was "self limiting" and "[a]pprehensive to move," demonstrated "questionable effort, pain catastrophizing, and require[d] maximal encouragement throughout the session." (*Id.*)

Plaintiff returned to Grady on January 13, 2017. (R. 1200). She reported continued bilateral knee and lower back pain but reported relief from a previous joint injection to her right knee. (*Id.*)

4

Physical examination showed Plaintiff had no distress, edema, or joint effusion, with a normal gait and crepitus in her left knee. (R. 1203). Plaintiff received steroid injections in both knees on January 25, 2017, and May 1, 2017, the first of which reportedly provided no relief. (R. 1228, 1280, 1583).

On March 6, 2017, Plaintiff received x-rays of both hips and the lumbar spine, and a CT of her left hip. (R. 1377-78). The x-rays showed degenerative disc disease at L5-S1 and mild multilevel facet arthropathy of the lower lumbar spine, but no abnormalities in Plaintiff's hips. (R. 1377-78). The CT of Plaintiff's left hip, however, revealed "[d]egenerative changes of the bilateral sacroiliac joints" and "[o]steitis pubis." (R. 1377).

Plaintiff returned to physical therapy on March 17, 2017, where she reported continued hip pain at a 10 out of 10 on her right side and a 2 out of 10 on her left. (R. 1422-23). She again appeared "self limiting" and "[a]pprehensive to move," demonstrated "questionable effort, pain catastrophizing, and require[d] maximal encouragement through [the] session." (*Id.*) Plaintiff also presented with a "slow, antalgic gait without an assistive device despite multiple times of being educated that using a cane may help improve gait mechanics and reciprocal gait." (R. 1423-24). She responded that she could not "use a single point cane due to pain in" upper extremities. (R. 1424). Upon examination, Plaintiff's pain limited her range of motion and strength in her knees, as well as her "tolerance to standing, effortful transfers and overall movement[.]" (*Id.*)

Plaintiff presented to Grady Hospital on August 15, 2017, complaining of left lower back pain that radiated down her left leg. (R. 3939). On examination, she had no distress, cyanosis, edema, or clubbing noted in her extremities, an appropriate muscle mass in all extremities, 4/5 in muscle strength, completely diminished reflexes, and no difficulty ambulating without assistance. (R. 3942). Plaintiff had pain on palpation of her lumbar spine and bilateral facet joints but not of

her paraspinal muscles, pain with facet loading procedures and Patrick's maneuver, decreased extension and flexion, negative bilateral straight leg raising tests, and normal ranges of motion in all extremities. (R. 3943). An MRI of Plaintiff's lumbar spine revealed degenerative disc disease at T10-T11, L4-L5, and L5-S1, advanced ongoing facet degeneration at L4-5, and subarticular stenosis at L5-S1 on the left side. (R. 3944).

On October 10, 2017, Plaintiff presented to Emory Hospital complaining of numbness in her shoulder and buttocks, and moderate to severe pain radiating intermittently down her legs. (R. 4048). On examination, Plaintiff had no distress, peripheral edema, or lymphadenopathy in her extremities, exhibited tenderness with light palpation, and demonstrated grossly normal muscle tone as she gave little effort. (R. 4048-49). When Plaintiff returned on November 8, 2017, she exhibited the same findings upon physical examination. (R. 4047). By November 11, 2017, on the other hand, she had mild distress, mild tenderness, decreased range of motion in her back, but normal musculoskeletal findings. (R. 3812). The physician attributed Plaintiff's pain to her sciatica diagnosis. (R. 3813).

Plaintiff returned to Emory on November 18, 2017, with complaints of back pain that radiated into her lower extremities and buttocks. (R. 1703). Bending over, moving, standing, and changing positions reportedly exacerbated Plaintiff's pain. (*Id.*) Physical examination revealed her to be in mild distress, with decreased sensations in the perineal area, the bilateral buttocks area below the L5 level, and the sacral area. (R. 1708). Plaintiff exhibited tenderness over her lumbar area, a positive straight leg raising test, normal range of motion in her musculoskeletal, decreased range of motion in her back, and limited range of motion in her lower extremities due to pain. (*Id.*) Plaintiff remained in the hospital until November 27, 2018, when she showed no distress and only somewhat diminished bilateral leg strength. (R. 1753).

An MRI of Plaintiff's lumbar spine revealed "[m]ultilevel spondylosis most prominent at L4-L5 with mild disc bulge, superimposed left foraminal disc extrusion, mild spinal canal stenosis, and moderate left neural foraminal narrowing." (R. 1750). It also showed a "[l]eft foraminal disc extrusion at L5-S1 with moderate bilateral neural foraminal narrowing." (*Id.*) An MRI of Plaintiff's cervical spine revealed "[m]ild multilevel spondylosis" which was "most prominent at C5-6 with moderate spinal canal stenosis, moderate left and mild right neural foraminal narrowing." (R. 1752). A thoracic spine MRI showed "[m]ultilevel spondylosis" which was "most prominent at T7-8 and T8-9 with mild spinal canal stenosis." (*Id.*)

Plaintiff returned to Emory on December 1, 2017, complaining that a recent fall exacerbated her lower back pain, which she described as severe and like burning. (R. 3980). Plaintiff denied numbness but expressed tingling in her feet. (*Id.*) Upon examination, she appeared not to be in distress but had notable tenderness with palpation of her thoracic and lumbar spine which caused her to kick her legs and could not lift either leg due to pain. (R. 3985). When Plaintiff presented to Emory on December 19, 2017, she continued to complain of pain that radiated intermittently down her legs, along with numbness in her shoulders and buttocks. (R. 4036). Plaintiff had no distress upon examination and no "peripheral edema or extremity lymphadenopathy." (R. 4037). On musculoskeletal examination, Plaintiff was tender to light palpation, but manual muscle test observations were "grossly normal," despite "limited effort." (*Id.*)

On February 1, 2018, Plaintiff presented to Emory Hospital complaining of intense pain in her right ankle, primarily the medial malleolus, from a fall the previous December. (R. 4034). She reportedly slipped and could not remember[2] how she landed when she fell, but reported no

---

[2] Notably, the next time Plaintiff recounted this fall, she reported "slipped on the floor and fell backwards landing on her low back and then upper back" which forced her arms into an external rotation. (R. 4029).

discoloration or swelling immediately afterwards. (*Id.*) Physical examination showed Plaintiff had no distress, a steady but slow gait with the use of her cane, tenderness upon palpation, and mild swelling in her ankle "but no ecchymosis, erythema or bony deformity." (R. 4035). Plaintiff's pain from her "right ankle plantar flexion, dorsiflexion, and inversion and eversion" limited her range of motion and motor testing. (*Id.*) The provider diagnosed Plaintiff with a right ankle sprain, and instructed her to rest, wear a boot, and perform physical therapy exercises at home. (*Id.*)

Plaintiff followed-up for her sprained ankle March 8, 2018, with reportedly severe pain to the point of hesitating to move her ankle. (R. 4032). Her physical examination showed she had no distress, a stable gait, and tenderness upon palpation of her right ankle deltoid and ATFL ligaments. (*Id.*) Plaintiff had an active range of motion of 5 degrees in her "dorsiflexion, plantarflexion, inversion, and eversion." (*Id.*) Her passive range of motion "increased only minimally due to her pain." (*Id.*) Plaintiff received a cortisone injection which assisted her pain. (R. 4029, 4033).

On March 15, 2018, Plaintiff followed-up with Emory Hospital regarding her knee pain. (R. 4027). Plaintiff's physical examination revealed she had no distress and an "antalgic but stable" gait "with use of her walker." (*Id.*) Upon palpation, she displayed marked tenderness at her medial joint line in both knees, some tenderness at her right knee lateral joint line, and pain to her anterior/posterior and varus/valgus ligaments though she showed no instability there. (R. 4027-28). Plaintiff had patellofemoral crepitus in her left knee, a positive grind test bilaterally, a 4+/5 but painful bilateral knee extension, and normal bilateral knee flexion. (R. 4028). It was opined that Plaintiff's knee pain had exacerbated due to her ankle injury. (*Id.*) Plaintiff received cortisone injections for treatment and instructed to limit her time in her boot. (*Id.*)

Plaintiff returned to Emory Hospital on March 30, 2018, due to lower back pain. (R. 2738). A physical examination indicated Plaintiff had no distress, severe tenderness in her lumbar and

sacral back, and a positive simulated spine rotation. (R. 2742). Plaintiff exhibited a normal range of motion and strength. (*Id*.) An x-ray of Plaintiff's spine indicated "degenerative facet changes" in her "lower lumbar spine." (R. 2744).

On May 8, 2018, Plaintiff returned to Emory Hospital for her bilateral knee pain, where she ambulated with a cane and requested a prescription for hydrocodone. (R. 4024). Plaintiff's previous cortisone injections reportedly provided her with two weeks of relief. (*Id*.) On examination, Plaintiff did not appear to be in acute distress but did not look comfortable; she had mild effusions in both of her knees and displayed marked tenderness upon "palpation at the medial and lateral joint line in the right knee and medial joint line only in the left knee." (*Id*.) Plaintiff demonstrated right knee range of motion between 5 and 105 degrees and between 0 and 110 degrees in her left. (*Id*.) She had patellofemoral crepitus in both of her knees, painful knee extensions at 4+/5 bilaterally, and normal bilateral knee flexion. (R. 4024-25).

Plaintiff presented to Emory Hospital on May 22, 2018, with pain throughout her entire left leg and numbness in her toes. (R. 4022). Plaintiff had a positive left straight leg raising test and an antalgic gait with the use of a cane. (R. 4023). Her full physical examination could not be assessed, however, as Plaintiff persistently exerted "submaximal effort[.]" (*Id*.) Due to her reported allergies, Plaintiff requested a prescription for narcotics. (*Id*.) When the physician refused, Plaintiff "was quite upset and became hysterical[.]" (*Id*.)

On June 4, 2018, Plaintiff returned to Emory Hospital complaining of pain in both legs, primarily the left, that radiated through her lower extremities. (R. 4018). Plaintiff exhibited severe tenderness and spasms throughout her thoracic lumbar spine, normal ranges of motion in her hips, and weakened motor strength throughout both lower extremities. (R. 4020). Plaintiff could not perform the heel or toe walk on either side due to pain, but she displayed no muscle atrophy and

had normal reflexes, normal senses, and negative straight leg raising tests. (*Id.*) It was noted that a "true motor exam" could not be obtained due to Plaintiff's pain, but there was "no obvious focal weakness noted[.]" (*Id.*) Plaintiff was diagnosed with lumbar degenerative disc disease, disc degeneration at the L5-S1 level, and synovitis at the L4-5 facet joints. (R. 4021).

Plaintiff followed-up at Emory Hospital on June 14, 2018, for her bilateral knee pain, though she noted her ankle pain had improved. (R. 4011). Plaintiff had no distress on examination, a stable gait with her cane, tenderness on palpation to her knees, patellofemoral crepitus in both of her knees, and a 5/5 knee extension. (R. 4012). She had 0 to 115 range of motion in her left knee and 5 to 110 degrees in her right. (*Id.*) Plaintiff had decreased swelling in her ankle, but remained tender at her Achilles and ATF ligament. (*Id.*) Her ankles exhibited 40 degrees at her plantar flexion, 10 degrees at the dorsiflexion, and she had normal sensation in her lower extremities. (*Id.*) Plaintiff received cortisone injections to her knees to relieve her pain. (R. 4012).

On July 12, 2018, Plaintiff presented to Emory Hospital with persistent pain and numbness in her lower left back. (R. 2648). Plaintiff's physical examination revealed she had moderate distress, no back tenderness, but minimal palpation produced pain. (R. 2651-52). Additionally, Plaintiff's musculoskeletal exam showed normal range of motion and strength and no tenderness. (*Id.*) An MRI of Plaintiff's lumbar spine indicated a "[t]iny 1 mm enhancing focus within the cauda equina at . . . the L4-L5 disc space" which had not been previously seen, "[n]o significant interval change at L4-L5 with superimposed left foraminal protrusion contacting the exiting left L4 nerve root and moderately narrowing the left L4-L5 neural foramen." (R. 2646-47). "Moderate bilateral facet arthropathy" was indicated "at L4-L5 with facet joint effusions." (*Id.*) Finally, there was a "[c]ircumferential disc bulge at L4-L5" that "contacts the bilateral descending L5 nerve roots with left greater than right subarticular zone narrowing." (*Id.*)

Plaintiff returned to Emory Hospital on July 16, 2018, complaining of extreme pain in her left sciatica. (R. 2600). She arrived in a wheelchair but did not appear to be in distress at her initial examination. (*Id*.) By the time of her physical examination, Plaintiff had mild distress, mild lumbar tenderness, pain with palpation of her left posterior thigh, a painful straight leg raise with her left leg, but an otherwise normal range of motion in her back and musculoskeletal system. (R. 2604).

On July 30, 2018, at an examination at Emory Hospital, Plaintiff reported sharp, shooting pain in her lower back and left leg. (R. 4003). Her physical examination revealed no muscle atrophy in her extremities, normal ranges of motion, and normal muscle strength except a diminished lower left extremity at 4+/5, which appeared "likely pain limited." (R. 4005). Plaintiff had an antalgic gait with a walker and diminished sensation in her left anterior distribution. (*Id*.) Plaintiff exhibited the same physical examination findings when she returned on August 30, 2018. (R. 3039). An MRI showed "a far lateral disk herniation contacting the exiting L4 nerve root along with a mobile grade 1 spondylolisthesis at L4-L5." (R. 3030). Plaintiff underwent a lumbar fusion at the L4-L5 level, but her pain worsened following the procedure. (*Id*.) A postoperative MRI did not show any significant abnormalities other than the expected "fluid collection in surgical bed leading to central stenosis at L4/L5 level[.]" (R. 3030, 3087)

Plaintiff returned to Emory Hospital on October 8, 2018. (R. 4000). She reported "improved strength in the left lower extremity" along with "40% improvement in pain[.]" (R. 4000-01). Physical examination showed a severe limitation in Plaintiff's lumbar flexion due to pain, normal thoracic and cervical spine ranges of motion, and normal muscle strength in all extremities, except that the left lower extremity showed slightly diminished strength. (*Id*.) Plaintiff had an antalgic gait with a walker and diminished sensation in her left anterior distribution. (*Id*.)

On November 30, 2018, Plaintiff called Emory Hospital complaining that her back and leg pain had worsened. (R. 4000). A new MRI and CT of Plaintiff's lumbar spine were obtained in response. (*Id*.) The MRI showed her spinal canal stenosis at L4-L5 had improved, as there was no indication of epidural fluid collection, no "significant interval change of left epidural space fibrosis at the L4-5 level." (R. 3997). The "[n]erve roots at the L3-4 level appear[ed] to be more adherent to each other posteriorly" although the "clumping of nerve roots more inferiorly" could suggest Plaintiff had developed arachnoiditis. (R. 3997). The CT showed "[p]ostsurgical changes following L4-L5 posterior spinal fusion and left L4 hemilaminectomy" and "[s]oft tissue density within the left subdural space at the L4-5 level extending into the left neural foramen." (R. 3999).

On December 19, 2018, Plaintiff returned to Emory Hospital complaining of persistent pain in both knees. (R. 3994). Plaintiff exhibited tenderness with palpation at her medial joint, but her knees were otherwise stable with normal range of motion, intact sensation, full strength, and normal patellar tracking. (*Id*.) Plaintiff received corticosteroid injections in both knees and was instructed to return in three months. (R. 3995).

## II.   Mental Health

The relevant mental health record begins in June 2015, when Plaintiff attended a mental health evaluation at Grady Hospital. (R. 387). She presented as alert, oriented, and cooperative, with a euthymic mood, unremarkable thought process, and fair judgment and insight. (R. 388). Plaintiff reported she daily felt depressed, tired, jumpy, inattentive, nervous, and fearful, and had one to two panic attacks a week. (R. 389-90). She was diagnosed with an anxiety disorder. (R. 387). Plaintiff returned to Grady in July 2015, requesting to restart her mental health treatment. (R. 423). She presented as cooperative, oriented, and alert, with a fair insight, poor judgment, depressed mood and affect, and with auditory hallucinations. (R. 424). Plaintiff received the further

diagnosis of notable cluster B traits and depressive disorder, the latter of which appeared to be situational. (*Id*.)

When Plaintiff sought treatment from Grady in September 2015, she presented as oriented, alert, calm, and cooperative, with intermittent eye contact and judgment, good attention and concentration, and no hallucinations. (R. 488-89). Plaintiff had a tired and constricted mood and a circumstantial thought process. (*Id*.) Plaintiff received additional diagnoses of a mood disorder and posttraumatic stress disorder ("PTSD"). (*Id*.)

Plaintiff presented for psychiatric treatment on December 11, 2015, where she had a depressed and tearful mood and limited judgment and insight. (R. 700-01). Nevertheless, she appeared fully alert and oriented, with intact associations, goal directed thought processes, a fair concentration, and no indications of hallucinations. (*Id*.) The provider opined that individual therapy would benefit Plaintiff. (R. 701).

Plaintiff returned to Grady on February 12, 2016, for individual psychiatric therapy. (R. 748). Plaintiff's affect had notably been brighter than before, however she continued to experience everyday stressors. (*Id*.) Examination revealed Plaintiff as alert and oriented, with normal behavior and psychomotor activity, euthymic mood and affect, intact associations, fair concentration, linear and goal directed thought processes, intermittent insight and judgment, and no indication hallucinations. (R. 749). Plaintiff received the additional diagnosis of bipolar disorder. (*Id*.)

On May 20, 2016, Plaintiff returned to Grady for a psychiatric therapy session. (R. 838). Upon examination Plaintiff appeared alert and oriented, with a full and euthymic mood and affect, intact associations, circumstantial thought processes, limited insight and judgment, and no hallucinations. (R. 839). Plaintiff followed-up for psychiatric therapy on September 7, 2016, as instructed. (R. 840, 984). At this examination, Plaintiff presented as tearful, alert, and oriented,

with a dysphoric mood, intact associations, increased rate of thought processes, limited but fair insight and judgment, and ego-syntonic obsessions about cleanliness. (R. 985).

When Plaintiff attended her next therapy session on October 12, 2016, she expressed continuous frustration, primarily due to her physical pain. (R. 1105). Psychiatric examination revealed Plaintiff as alert and oriented, with a euthymic and reactive mood, intact associations and concentration, good insight and judgment, and obsessions with cleaning and organizing. (R. 1106). On January 4, 2017, Plaintiff presented to therapy as tearful and frustrated, stating that her depression had exacerbated. (R. 1127). The provider recommended that Plaintiff continue individual counseling services, in which she showed moderate interest. (*Id.*)

Plaintiff returned to Grady for therapy on January 18, 2017. (R. 1214). Plaintiff appeared uncomfortable in behavior, but had been fully alert and oriented and with a normal range of psychomotor activity. (R. 1214-15). Plaintiff had an irritable affect, congruent mood, tight associations, linear thought processes, fair insight and judgment, and no hallucinations. (R. 1215). At Plaintiff's next psychotherapy session on February 15, 2017, she reported feeling somewhat better, and had been "bathing daily and cleaning her home." (R. 1343). Plaintiff also stated that she "sees bugs moving close to her at night on her pillow that are not present" and "hears a buzzing noise" when it is quiet. (*Id.*) With the exception of these hallucinations, Plaintiff's psychiatric examination revealed generally normal findings. (R. 1344).

On March 15, 2017, Plaintiff underwent a psychological evaluation by Dr. Debra M. Lewis. (R. 1025). Plaintiff reported that she has difficulty relating with others, which hinders her ability to work. (*Id.*) She reported "depressed mood 7/7 days, crying spell 3/7 days, anhedonia (socializing), isolation, irritability, varied appetite, sleep only adequate with medication, low energy level, limited concentration and feelings of hopelessness, helplessness, and worthlessness."

(R. 1026). Plaintiff reported she lived with her seven- and twelve-year-old children, and did not require assistance with most of her daily activities, such as cooking simple meals, completing some chores, shopping, navigating public transportation, making decisions, organizing, and planning. (*Id*.) Nevertheless, she expressed she needed help with dressing, hygiene, and toileting, and "believes she cannot follow simple instructions or complete tasks due to forgetfulness." (*Id*.) Plaintiff had an irritable and depressed mood, and labile affect. (R. 1027). Following the examination, Dr. Lewis opined that Plaintiff had the functional ability to:

> [U]nderstand, remember and follow one and two step instructions. Her attention and concentration is somewhat limited but likely sufficient to satisfy the demands of elementary production norms. Irritable, she may have difficulty getting along with the public, coworkers and supervisors. Considering her emotional fragility, she may have difficulty adapting to some typical workplace stressors. If awarded benefits, she would not need assistance managing any funds received.
>
> (R. 1028).

Dr. Lewis qualified her observations by noting that Plaintiff "was not initially cooperative . . . was often evasive and resisted providing information" and appeared to have "exaggerated limitations when reporting her" activities of daily living. (*Id*.)

On April 13, 2017, Plaintiff presented to Grady Hospital for psychotherapy. (R. 1560). On examination, Plaintiff had a calm, but mildly irritable behavior, normal range of psychomotor activity, a euthymic and reactive mood and affect, intact associations, goal directed and linear thought processes, generally fair insight and judgment, intact concentration, no reported hallucinations, and an alert and oriented appearance. (R. 1562). Plaintiff returned to Grady on June 22, 2017, to undergo a health assessment for her ongoing mood disorder. (R. 1613). Plaintiff's mental status examination revealed her to be fully alert and oriented, with cooperative behavior,

euthymic mood, full affect, unremarkable thought content, tight thought processes, impaired memory, fair insight and judgment, and no reported hallucinations. (R. 1613-14).

On September 20, 2017, Plaintiff had a psychotherapy assessment at Dekalb Community Service Board. (R. 3894). She reported her medications, which she took inconsistently, and stated that she no longer worked, had a low and irritable mood, and isolated herself from everyone but her children. (*Id*.) When Plaintiff returned on September 26, 2017, she alleged that multiple everyday stressors caused her to lose sleep and to feel anxious, restless, and exhausted. (R. 3884). Her memory and concentration seemed impaired as she had difficulty relaying her life's history; she had a congruent mood, depressed and tired affect, and normal insight and judgment; and she alleged audio and visual hallucinations, but did not respond to the internal stimuli test. (R. 3888-89).

Plaintiff followed-up for psychotherapy on October 1, 2017, and continued to report her inability to sleep and visual hallucinations. (R. 3878). She stated her mood was okay, but also that her depression was so severe it caused her to feel numb. (*Id*.) Even though Plaintiff expressed her lack of desire to continue therapy, she returned on November 17, 2017. (R. 3875, 3880). Plaintiff reported she had a happy mood, slept through the night, had no hallucinations, but had recent impulsive tendencies. (R. 3875-77).

On June 7, 2017, Plaintiff returned for psychotherapy at Dekalb Community Service Board. (R. 3859). She expressed wanting "to make progress towards goals of managing pain, improving her ability to manage stress, and reducing anxiety." (R. 3861). Plaintiff had a normal mood, as well as normal rate, tone, and volume of speech. (*Id*.) She agreed to practice breathing deeply and to return for psychotherapy weekly. (*Id*.) It appears, however, that Plaintiff made no effort to follow through with these weekly sessions. (*See* R. 3857).

16

## DISABILITY EVALUATION IN PLAINTIFF'S CASE

Following the five-step sequential evaluation process, the reviewing ALJ made the following findings in Plaintiff's case. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date, December 31, 2015. (R. 22). At step two, the ALJ determined that Plaintiff suffered from "the following severe impairments: osteoarthritis, degenerative disc disease, asthma, obesity, depression, anxiety, and a personality disorder." (R. 23). The ALJ further determined that Plaintiff's "inflamed toenails, human papillomavirus (HPV), and herpes simplex virus (HSV)" were not severe impairments. (*Id*.)

Turning to step three, the ALJ found that Plaintiff's impairments did not meet or equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id*.) Therefore, the ALJ assessed Plaintiff's RFC and found that Plaintiff could "perform light work" with the following limitations:

> She can lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and walk for 6 hours in a day with normal breaks; sit for 6 hours in a day; can alternate from sitting to standing at intervals of 5 minutes at 30 minutes increments; this incidental postural shift does not cause significant time off task; occasionally climb ramps and stairs, balance, and stoop; cannot kneel, crouch, or crawl; occasionally push and pull with the lower extremities; can use a cane for ambulation; is capable of performing simple, routine tasks, that are not complex or complicated; can have occasional social interaction with the public and coworkers, which is on a brief casual level; can have occasional atmospheric exposure to such as to dust or smoke; cannot climb ladders, ropes, and scaffolds; cannot work around similar hazards such as unprotected heights (distraction factor).

(R. 26).

Based on Plaintiff's RFC, the testimony of the vocational expert ("VE"), and the mental and physical demands of the type of work, the ALJ determined at step four that Plaintiff was unable to perform her past relevant work as a fast-food worker, retail cashier, or hair stylist. (R. 33). At

step five, the ALJ found that Plaintiff could adjust to the requirements of other work, specifically, a routing clerk, marketing clerk, office helper, document preparer, taper printer circuit layout, and table worker. (R. 34). Accordingly, the ALJ concluded that Plaintiff was not "disabled" within the meaning of the Social Security Act. (R. 35).

### ANALYSIS

Plaintiff raises two arguments in this appeal—neither of which warrant remand. First, Plaintiff argues that substantial evidence does not support the ALJ's analysis of her subjective complaints of pain. Second, Plaintiff argues that substantial evidence does not support the weight accredited to the opinion of Dr. Lewis. As discussed below, the record does not support Plaintiff's claims.

### I.    Pain Standard

When a claimant asserts disability through testimony of pain or other subjective symptoms, the Eleventh Circuit "requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged pain." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (1991) (citing *Landry v. Heckler*, 782 F.2d 1551, 1553 (11th Cir. 1986)). If the objective medical evidence does not confirm the severity of the alleged symptoms, but indicates the claimant's impairment could reasonably be expected to produce some degree of pain and other symptoms, the ALJ evaluates the intensity and persistence of the claimant's symptoms and their effect on her ability to work by considering the objective medical evidence, the claimant's daily activities, treatment and medications received, and other factors concerning functional limitations and restrictions due to pain. *See* 20 C.F.R. § 404.1529. "If the ALJ discredits subjective testimony, he

must articulate explicit and adequate reasons for doing so." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)).

Plaintiff argues substantial evidence does not support the ALJ's decision to discredit her subjective limitations. In her decision, the ALJ first discussed Plaintiff's alleged limitations in "lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, hearing, stair climbing, memory, completing tasks, concentration, understanding, following instructions, using hands, and getting along with others." (R. 27, 305, 334). The ALJ further noted Plaintiff allegedly could "lift no more than 3 pounds, cannot squat or kneel, can only bend 3 inches, is limited to standing, walking, and sitting to no more than 3 minutes, experiences pain when engaged in such activities, requires a cane or support, has trouble getting along with others, has trouble stopping intrusive thoughts, gets angry a lot, and has confusion with talking, hearing, memory, completing tasks, and concentration." (R. 27, 300, 305, 329, 334).

Following a review of Plaintiff's allegations, the ALJ discussed the relevant medical record including Plaintiff's subjective complaints to physicians and their medical findings. The ALJ noted that although Plaintiff frequently reported pain in her spine, ankles, knees, and upper right extremities, treatment notes consistently demonstrated normal musculoskeletal and neurological findings. For example, numerous records cited by the ALJ, including some of the more recent, observed that Plaintiff was not in distress, had a full range of motion, showed no evidence of joint effusion, and had normal muscle strength and gait.

That is not to say the ALJ found no evidence corroborating some of Plaintiff's pain. The ALJ discussed findings that Plaintiff exhibited "some right shoulder deficits," "signs of assistive device usage," painful range of motion, uneasy gait, tenderness in areas, "minor motor strength decreases, knee crepitus, and positive straight leg raises." (R. 27-28). The ALJ also noted instances

where "more significant motor strength deficits and gait abnormalities" were documented, although noting that Plaintiff exhibited "questionable effort" and "pain catastrophizing" during such examinations. (R. 28). Additionally, the ALJ noted that such "deficits were far from consistently documented." (*Id.*)

The ALJ also discussed the diagnostic imaging results of Plaintiff's spine, shoulder, knees, and ankles. The findings from early spinal images showed "degenerative changes, mild to moderate levels of central canal stenosis, moderate subarticular stenosis, mild facet arthropathy, and moderate neural foraminal narrowing." (*Id.*) More recent images showed a herniated disc, "fluid and edema producing critical spinal canal stenosis[,]" and "a tiny enhanced focus within the cauda equina." (R. 28). Images of Plaintiff's knee showed mild arthritis in her right knee early on, which developed into severe generative joint disease, and mild to moderate generative joint disease in her left knee. Degenerative changes were noted in Plaintiff's "right elbow and hips" and one physician suggested Plaintiff had "ankle impingement syndrome." (*Id.*) According to the ALJ, such findings were "not indicative of substantial limitation" as Plaintiff alleged. (*Id.*)

The ALJ further found support in her decision through Plaintiff's daily activities. The ALJ noted that the ability to care for a child, as Plaintiff reportedly does, "is not indicative of an individual who is limited to a substantial extent either physically or mentally." (R. 30). The ALJ further found that Plaintiff's ability independently to fold laundry, clean a toilet, cook simple meals, and go shopping further discredited her alleged limitations. The ALJ thus concluded that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" (R. 27).

On appeal, Plaintiff argues that objective medical evidence in the record contradicts the ALJ's findings. For example, Plaintiff cites treatment records indicating "tenderness to palpitation, decreased flexion and extension, and a positive Patrick's maneuver." (Doc. 17, p. 15). This argument, however, disregards further objective findings of no distress, negative straight leg raising tests, no difficulty ambulating, and normal range of motion. Plaintiff also notes more recent examinations revealing "severe limitation in lumbar flexion secondary to pain." (*Id.*) This finding led to her lumbar fusion surgery in August 2018, which she claims ultimately provided no relief. Upon review of a post-surgery MRI study, Dr. Gary found "some new narrowing above" the location of her fusion "at L3/4 and . . . clumping of the nerve roots." (R. 4000). While Plaintiff contends that this finding evidences her continued, severe pain, there is no indication that Dr. Gary sought further examination of Plaintiff, and he continued to prescribe conservative treatment, including physical therapy and tramadol and Tylenol for pain. (R. 4001).

In support of her reports of knee pain, Plaintiff cites treatment notes showing "a limited range of motion, tenderness to palpitation, and bilateral edema in both knees." (Doc. 17, p. 16). At such examinations, however, Plaintiff exhibited "questionable effort, pain catastrophizing, and require[d] maximal encouragement throughout [the] session." (R. 1180, 1244). While Plaintiff notes findings of "patellofemoral crepitus and a positive grind test[,]" the treatment record also shows no distress and a stable gait with a walker. (Doc. 17, p. 16). Additionally, the x-rays cited by Plaintiff showing "significant degenerative joint disease in her right knee, and moderate degenerative changes in her left knee" fail to demonstrate the alleged severity of Plaintiff's pain. As the ALJ pointed out, Plaintiff had minimally invasive treatment and the more substantial deficits noted by physicians appeared to be few and far between.

Even if Plaintiff cannot walk or stand for a period of more than fifteen minutes or sit for a period of more than five minutes, as she argues the evidence demonstrates, the ALJ's decision would not be disturbed. The ALJ incorporated into the RFC that Plaintiff needs to "alternate from sitting to standing at intervals of 5 minutes at 30 minute increments[.]" (R. 26). The ALJ also noted that Plaintiff would use a cane for ambulation. (*Id.*) The VE's testimony indicates that placing Plaintiff at a sedentary work level as opposed to light work would not preclude Plaintiff from working. (R. 71). Thus, even if the ALJ erred in determining Plaintiff had a light exertional level as opposed to sedentary, the error would be harmless "because the correct application would not contradict the ALJ's ultimate findings[.]" *Wright v. Barnhart*, 153 F. App'x 678, 684 (11th Cir. 2005) (citing *Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983)).

## II.     Opinion Evidence

An ALJ must evaluate every medical opinion in the record, *see* 20 C.F.R. §§ 404.1527(c), 416.927(c), and must state with particularity the weight given to those opinions and the reasons therefor. *See Winschel*, 631 F.3d at 1179. In determining the weight to accord each medical opinion, the ALJ must consider several factors, including the examining and treating relationship between the physician and the claimant, the physician's presentation of supporting medical evidence, the opinion's consistency with the record as a whole, the physician's specialty, and other factors. *Id*. Generally, a treating physician's opinion is entitled to considerable or controlling weight, *see* §§ 404.1527(c)(2), 416.927(c)(2), whereas the opinion of a one-time examiner is entitled to neither deference nor great weight. *See Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1160 (11th Cir. 2004); *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987). In any event, "the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion," *Oldham v. Schweiker*, 660 F.2d 1078, 1084 (5th Cir. 1981), when the "physician's

opinion was not bolstered by the evidence," or when the "physician's opinion was conclusory or inconsistent with the doctor's own medical records[.]" *Winschel*, 631 F.3d at 1179 (internal quotation marks omitted).

The ALJ's decision to accord one-time examiner Dr. Lewis' opinion partial weight is supported by substantial evidence. Dr. Lewis opined that Plaintiff had the ability to "understand, remember and follow one and two step instructions." (R. 1028). While Plaintiff's "attention and concentration" appeared "somewhat limited" Dr. Lewis found that Plaintiff could "likely . . . satisfy the demands of elementary production norms." (*Id.*) Dr. Lewis also noted that Plaintiff "may have difficulty getting along with the public, coworkers and supervisors" and "may have difficulty adapting to some typical workplace stressors." (*Id.*) The ALJ specifically found the last portion of Dr. Lewis' opinion "[e]xcessively subjective[.]" (R. 32). According to the ALJ, such impressions do not indicate Plaintiff's maximum functional abilities given Dr. Lewis' use of language such as "may" and "likely[.]"

Additionally, the longitudinal mental records contradicted Dr. Lewis' opinion. While the ALJ noted some mental deficits found by Plaintiff's treating physicians, such findings were "not consistent, and not indicative of great limitation." (R. 32). Moreover, while Plaintiff underwent formal mental health treatment, there is no evidence that she required "more invasive forms of treatment, such a[s] impatient psychiatric treatment." (*Id.*) Based on these records, there is substantial evidence to support the ALJ's rationale for affording Dr. Lewis' opinion partial weight.

Plaintiff attempts to undermine the ALJ's decision by pointing to Dr. Lewis' findings of "an irritable and depressed mood; a combative and tearful affect; reduced energy and processing speech; mild to moderate problems with attention and concentration; and limited insight and judgment." (Doc. 17, p. 18). She argues these findings demonstrate Dr. Lewis' opinion was not

entirely based on Plaintiff's subjective complaints. She overlooks, however, that Dr. Lewis also observed that Plaintiff "was not initially cooperative . . . was often evasive and resisted providing information" and "exaggerated limitations when reporting her" daily activities. (R. 1028).

Plaintiff also contends that other treatment records corroborate Dr. Lewis' opinion. In support thereof, Plaintiff cites three treatment records demonstrating "a tearful or depressed mood during some visits, circumstantial though processes, visual hallucinations, and obsessive thoughts regarding cleanliness" and three treatment records demonstrating a "depressed mood, occasional hallucinations, obsessions, and irritability[.]" (Doc. 17, p. 19). Such examinations also revealed that Plaintiff as alert and fully oriented, with mostly normal behavior and psychomotor activity, limited at times but generally fair judgment and insight, a euthymic mood, and an intact concentration and memory. Thus, Plaintiff has failed to demonstrate that the cited evidence undermines the ALJ's decision or supports a greater limitation in Plaintiff's social functioning.

## **CONCLUSION**

For the reasons discussed herein, the Commissioner's decision denying Plaintiff's application for disability benefits is **AFFIRMED**.

**SO ORDERED**, this 25th day of August, 2021.


s/ Charles H. Weigle_____
Charles H. Weigle
United States Magistrate Judge